**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
|  | ) |  |
| **AVAYA, INC.,** | ) |  |
|  | ) |  |
| **Plaintiff,** | ) |  |
|  | ) |  |
| **v.** | ) | **Civil Action No. 12-10660-DJC** |
|  | ) |  |
| **MOHAMAD ALI,** | ) |  |
|  | ) |  |
| **Defendant.** | ) |  |
|  | ) |  |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                    July 13, 2012

**I.      Introduction**

Plaintiff Avaya, Inc. ("Avaya") has sued Mohamad Ali ("Ali"), its former Senior Vice

President, alleging that Ali breached his contract with Avaya when he accepted a position with a

rival corporation. Avaya has moved for a preliminary injunction. For the reasons discussed below,

Avaya's motion is GRANTED with an order to issue, upon the filing of a bond, pursuant to the

terms noted below.

**II.     Burden of Proof and Standard of Review**

The burden of providing a factual basis sufficient to justify a preliminary injunction rests

with the party seeking the injunction. Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir.

2003). Unless the parties' competing versions of events are "in sharp dispute such that the

'propriety of injunctive relief hinges on determinations of credibility,'" Rohm & Haas Elec.

Materials, LLC v. Elec. Circuits Supplies, Inc., 759 F. Supp. 2d 110, 117 (D. Mass. 2010) (quoting

Campbell Soup Co. v. Giles, 47 F.3d 467, 470 (1st Cir. 1995)), the Court is free to accept as true

"well-pleaded allegations [in the] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction." Id. at 114 n.2 (quoting Elrod v. Burns, 427 U.S. 347, 350 n.1 (1976)).

## III.    Factual Background

### A.    Avaya and Ali

Avaya is a global provider of business communication products and services, including products and services designed to support customer contact centers, as well as products and services unrelated to the contact center field.  Declaration of Avaya Senior Vice President Brett Shockley, D. 10-1 at ¶¶ 3-4.[1]  Avaya has spent substantial time, effort and resources developing contact center technologies for its products and customers and, as a result, possesses confidential trade secret information about its customers, sales, products and strategies regarding the contact center business. Declaration of Avaya Director for Corporate Security William Parkin, D. 10-4 at ¶ 3.  These trade secrets include strategic plans, budgets, market research, sales leads, customer specifications, and technology, all of which are protected by a combination of physical and electronic security measures and various company confidentiality policies.  Parkin Decl., D. 10-4 at ¶¶ 4-5, 7.  Avaya also sells "workforce optimization" software that can be added to Avaya's customer center products. Shockley Decl., D. 10-1 at ¶ 11.  These workforce optimization features include the ability to record calls at a contact center, contact center agent feedback tools, and analytical tools allowing Avaya's customer to access whether the contact center is appropriately staffed and to manage contact center agents.  Id. at ¶¶ 11-12.  In general, Avaya does not sell its workforce optimization products

---

[1] To date, the parties have redacted and/or sealed various docketed materials with leave of Court.  The Court has reviewed all versions of the filings, including the unredacted versions.

separately from its contact center products.  Id. at ¶ 14.  Avaya derives at least 10% of its annual

gross revenues from its contact center business.  Declaration of Avaya Finance Director Clause

Gaebele, D. 10-2 at ¶ 3.

Ali graduated from Stanford, worked for a small company that focused on optimizing

manufacturing processes, and then later worked for IBM, where his focus was business optimization

and  workforce optimization.  Ali Declaration, D. 21-1 at ¶¶ 2-5.

**B.     Ali Joins Avaya**

On June 23, 2009, Avaya offered Ali a position as Avaya's "Senior Vice President,

Corporate Business Development & Strategy," reporting directly to Avaya's Chief Executive

Officer, Offer Letter, D. 32-1 at 5, and serving on Avaya's Executive Committee, a group of senior

Avaya executives that met weekly to create, review, and approve Avaya's competitive strategies and

to review the performance of each aspect of Avaya's business.  Shockley Decl., D. 10-1 at ¶¶ 2, 9-

10.  At the same time Avaya provided Ali with his offer letter, Avaya also provided him with a

document titled "Compensation Model for Mohamad Ali – Discussion Draft" that included a series

of slides detailing the various ways (salary, bonuses, stock options, etc.) Avaya would compensate

Ali for his work.  Compensation Model, D. 32-1 at 14-20; Supp. Ali Decl., D. 35-1 at ¶ 3.  The

compensation model stated that "[t]o receive your [stock] option award, you will be required to

execute a Management Stockholder's Agreement that will . . . contain standard confidentiality, non-

solicitation provisions, and non-compete provisions."  Compensation Model, D. 32-1 at 18.  The

stock options were also summarized in Ali's offer letter, Offer Letter, D. 32-1 at 6, which both

described the stock options and stated that "[t]he specific terms of your [stock option] award are

contained in . . . your individual award agreements, which exclusively control your stock options

and supersede any other written or oral representations concerning your options, including this letter.

You will receive a copy of the . . . agreements after your award has been approved." Id.

### C.    Terms of Ali's Avaya Stock Option Awards

On August 28, 2009, after Ali had begun working at Avaya, he received a series of stock-option-related documents, including a form "Senior Management Nonstatutory Time-Based Option Agreement" (hereinafter "Form Stock Agreement"), D. 32-2 at 5-21, as well as a variety of other stock agreements and stock-related documents and a cover letter indicating that Ali had qualified for a stock award, explaining the various documents in the series, and stating that the stock options would be cancelled if Ali did not accept the terms and conditions of the stock option agreements. Avaya Suppl. Brief, D. 32 at 2-3. The Form Stock Agreement included an appended schedule titled "Non-Disclosure, IP Assignment and Non-Competition,"[2] which states in a section titled "Non-Competition and Other Restricted Activity" that:

> during the 12-month period immediately following the termination of the Optionee's employment for any reason, the Optionee will not work for or provide services to, in any capacity, whether as an employee, independent contractor or otherwise, whether with or without compensation, to any Material Competitor (as defined below).

Form Stock Agreement, D. 32-2 at 13-14, § 3.1. In a subsequent section of the Form Stock Agreement, the term "Material Competitor" is defined as:

> an entity, or a division or subsidiary of a multi-division entity or holding company, which engages in business in one or more of the fields in which [Avaya] conducts business and from which [Avaya] derives at least 10% of its annual gross revenues,

---

[2] Ali asserts, and Avaya does not dispute, that the cover letter erroneously stated that this schedule addressed issues of non-disclosure, IP assignment and non-solicitation, rather than non-disclosure, IP assignment and non-competition, see Avaya Suppl. Brief, D. 32 at 2-3, but there is no dispute that the schedule itself included the term "Non-Competition" rather than "Non-Solicitation" in the title. Form Stock Agreement, D. 32-2 at 12.

as determined on the date of the Optionee's termination of employment with [Avaya] or an affiliate, as applicable.

Id. at 17, § 6.  The "Non-Competition and Other Restricted Activity" section of the Form Stock

Agreement also states that:

> [i]n signing the Award Agreement, the Optionee gives [Avaya] assurance that the Optionee has carefully read and considered all the terms and conditions hereof.  The Optionee acknowledges without reservation that each of the restraints contained herein is necessary for the reasonable and proper protection of the good will, Confidential Information and other legitimate business interests of [Avaya], that each and every one of those restraints is reasonable in respect to subject matter, length of time and geographic area; and that these restraints will not prevent the Optionee from obtaining other suitable employment during the period in which he or she is bound by them.  The Optionee will never assert, or permit to be asserted on the Optionee's behalf, in any forum, any position contrary to the foregoing.  Were the Optionee to breach any of the provisions of this Agreement, the harm to [Avaya] would be irreparable.  Therefore, in the event of such a breach or threatened breach, [Avaya] shall, in addition to any other remedies available to it, have the right to obtain preliminary and permanent injunctive relief against any such breach or threatened breach without having to post bond.

Id. at 15, § 3.6.  With regard to consideration for the aforementioned obligations, the Form Stock

Agreement's preamble notes that:

> [t]he Optionee undertakes the obligations in this Schedule . . . in consideration of the Optionee's initial and/or ongoing employment with [Avaya], the Optionee's opportunity to acquire equity in [Avaya], the Optionee's being granted access to trade secrets and other confidential information of [Avaya], and for other good and valuable consideration, the receipt and sufficiency of which the Optionee acknowledges.

Id. at 12.  Finally, in a section titled "Governing Law," the Form Stock Agreement states that:

> [t]his Agreement and all claims arising out of or based upon this Agreement or relating to the subject matter hereof shall be governed by and construed in accordance with the domestic substantive laws of the State of Delaware without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

Id. at 9, § 11.

On two separate occasions in November 2009, Avaya notified Ali that he had been awarded

stock options and provided him with a Stock Option Award Agreement in electronic form that included language identical to the above-quoted language from the Form Stock Agreement transmitted to Ali on August 28, 2009.  Avaya Suppl. Brief, D. 32 at 3; Stock Option Award Agreements, D. 10-3 at 11-19, 21-29.  Specifically, the Stock Option Award Agreements and the Form Stock Agreement included identical non-compete language, compare Form Stock Agreement, D. 32-2 at 13-14, § 3.1 with Stock Option Awards, D. 10-3 at 16, § 3.1 and 26, § 3.1, identical definitions of "material competitor," compare Form Stock Agreement, D. 32-2 at 17, § 6 with Stock Option Awards, D. 10-3 at 18, § 5 and 28, § 5, identical language stating that Avaya has the right to obtain injunctive relief without posting a bond, compare Form Stock Agreement, D. 32-2 at 15, § 3.6 with Stock Option Awards, D. 10-3 at 17, § 3.6 and 27, § 3.6, identical preambulatory discussions of consideration, compare Form Stock Agreement, D. 32-2 at 12 with Stock Option Awards, D. 10-3 at 16, 26, and identical invocations of Delaware law as the law governing the agreement.  Compare Form Stock Agreement, D. 32-2 at 9, § 11 with Stock Option Awards, D. 10-3 at 12, § 10 and 22, § 10.

In December 2009, Ali reviewed each of the two electronic Stock Option Award Agreements and in each case clicked on a box accepting the terms of the Agreement, effectively signing the agreement.  Avaya Suppl. Brief, D. 32 at 3; Ali Decl., D. 21-1 at ¶¶ 10-11; see also Stock Option Awards, D. 10-3 at 13, 23 (each stating that "[t]he Optionee understands that clicking the appropriate box, "Accept" for acceptance or "Reject" for rejection, indicates his or her irrevocable election to accept or reject, as applicable, the terms of the grant as set forth in this Agreement").

In April 2011, Ali changed jobs at Avaya, assuming a position described by Ali as "Senior Vice President of Avaya Global Services" and by Avaya as "Senior Vice President and President

of Client Services," the division of the company responsible for assisting Avaya's customers with

ongoing issues with Avaya products, including its contact center products.  Ali Decl., D. 21-1 at ¶

12; Shockley Decl., D. 10-1 at ¶¶ 5, 7.  In this role Ali oversaw what Avaya describes as its "contact

center transformation initiative," which Avaya asserts "included the management of and upgrades

for Avaya's Contact Center infrastructure."  Shockley Decl., D. 10-1 at ¶ 7.  In this role, Ali also

"participated in reviewing comparisons of Avaya's competitors' customer Contact Center product

features."  Id.

        In June 2011, Avaya notified Ali that once again he had been awarded stock options and

provided him with another Stock Option Award Agreement in electronic form that included

language identical to the above-quoted language from the Form Stock Agreement transmitted to Ali

on August 28, 2009 and to the language in the Stock Option Award Agreements that Ali entered into

in December 2009.  Avaya Suppl. Brief, D. 32 at 4; see generally Stock Option Award, D. 10-3 at

31-36.  With this grant, "the total number of stock options granted to Ali by Avaya to 1,200,000.

Avaya Suppl. Brief, D. 32 at 4.  Ali accepted the terms of the agreement, effectively signing it, in

July 2011.  Avaya Suppl. Brief, D. 32 at 4; Ali Decl., D. 21-1 at ¶ 10-11; Stock Option Award, D.

10-3 at 32.

        **D.      Aspect**

        Aspect Software, Inc. ("Aspect") develops, markets, licenses and sells software and hardware

products and services that enable businesses to manage communications with their customers and

employees, and makes and sells its own workforce optimization products and services.  Ali Decl.,

D. 21-1 at ¶ 13.  For years, Aspects employees worked on both customer contact center products and

services and workforce optimization products and services; Aspect has recently reorganized into

separate two divisions, interaction management (focused on customer contact operations) and workforce optimization, with James Foy, formerly the CEO of Aspect, serving as CEO of the interaction management division.  Affidavit of James Foy, D. 21-2 at ¶ 3; Ali Decl., D. 21-1 at ¶¶ 15-16.  Aspect's workforce optimization products are sold to integrate with customers' pre-existing contact center products, including contact center products sold by Avaya.  Shockley Decl., D. 10-1 at ¶ 15.  As this Court noted previously in Aspect Software, Inc. v. Barnett, 787 F. Supp. 2d 118 (D. Mass. 2011), a recent case where Aspect sued one of its former employees for leaving Aspect to work for Avaya, "Avaya is one of Aspect's main competitors," and the competition between Aspect and Avaya "is particularly intense with regard to customer contact center products." Id. at 123, 123 n.2.

### E.      Ali Leaves Avaya for Aspect

Ali states that he began considering leaving Avaya for Aspect in the spring of 2012.  Ali Decl., D. 21-1 at ¶ 13.  On February 17, 2012, Ali e-mailed himself a marked-up ".pdf" copy of the Form Stock Agreement he had received from Avaya on August 28, 2009, Ali E-mail and Attachment, D. 32-3 at 5-22, with various terms and provisions underlined (including portions of the non-competition clause and the definition of "material competitor"). Id. at 14-15, 18.  At some point in March or April of 2012, Aspect proposed an employment contract to Ali; the proposed contract contained a non-competition clause and a definition of "material competitor" that were roughly identical to the analogous clauses in the Form Stock Agreement.  Executive Employment Agreement, D. 10-5 at 47, 53.  On April 2, 2012, Ali notified Avaya that he had decided to leave Avaya to lead Aspect's workforce optimization division.  Ali Decl., D. 21-1 at ¶ 18.  Ali's last day at Avaya was April 13, 2012.  Id.

Ali's position at Aspect includes responsibility for all workforce optimization product development, product management, sales, and services, including the development of additional applications and markets for workforce optimization products and services. Ali Decl., D. 21-1 at ¶ 15. Ali asserts that these products and services can be used by customer companies "beyond and independent of [c]ustomer [c]ontact products and services." Id. All of Aspect's workforce optimization division employees "ultimately report" to Ali. Id. Ali is also responsible for Aspect's legal unit and its information technology unit, each of which serves both Aspect's workforce development and interaction management divisions. Id.

After Ali informed Avaya of his intention to leave for Aspect, but before he actually began working at Aspect, attorneys for Aspect and Avaya met in an effort to resolve disagreements between the two companies regarding Ali's non-competition obligations to Avaya and he began working at Aspect on April 16, 2012. Declaration of Avaya Attorney Marina C. Tsatalis, D. 10-5 at ¶¶ 2-11. No resolution was forthcoming, and on or about May 16, 2012, Aspect made a formal internal announcement regarding Ali's hiring as the new leader of Aspect's workforce optimization division. Id. at ¶ 12.

## IV.     Procedural History

Avaya initiated this lawsuit on April 12, 2012, filing a complaint alleging one count of breach of contract against Ali and one count of tortious interference against Aspect and seeking declaratory judgment. Complaint, D. 1 at ¶¶ 39-53. On May 16, 2012, Avaya amended its complaint, removing Aspect as a defendant but maintaining its breach of contract claim against Ali and continuing to seek declaratory judgment. Amended Complaint, D. 6 at ¶¶ 40-48. The next day, May 17, 2012, Avaya filed the instant motion for a preliminary injunction based on its breach of

contract claim against Ali, Motion, D. 9,[3] and submitted to this Court a draft injunctive order that would both enjoin Ali from violating the terms of his Stock Option Award Agreements and would excuse Avaya from posting a bond in connection with the Court's grant of injunctive relief. Proposed Order, D. 10-6. Ali filed his opposition to the motion on May 24, 2012. Ali Brief, D. 21. The Court held a hearing on the motion on May 31, 2012 and per the parties' request allowed the parties to file post-hearing briefs and exhibits. D. 31.[4] Avaya filed its post-hearing materials on June 1, 2012, Avaya Addendum, D. 32, and Ali filed his post-hearing materials on June 8, 2012. Ali Reply and Exhibits, D. 36, D. 37. **V.     Discussion**

To obtain a preliminary injunction, Avaya "bear[s] the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." Nieves-Márquez, 353 F.3d at 120. "The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." New

---

[3] Ali argues that Avaya's preliminary injunction motion should be "rejected out of hand," Ali Brief, D. 21 at 9, because Avaya failed to follow Local Rule 7.1(a)(2), which states that "[n]o motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue." L.R. 7.1(a)(2). Ali is correct that Avaya failed to attach a Rule 7.1 certification to its motion. See Motion, D. 9 at 2-3. However, at the same time Avaya filed its motion, it also filed the Tsatalis declaration, D. 10-5 at 1-5, which recounted at length the discussions between counsel prior to the filing of the preliminary injunction motion. Id. at ¶¶ 2-15. A Local Rule 7.1 certification was attached to the declaration. Id. at 5. Accordingly, the Court declines to reject the filing of Avaya's motion.

[4] Additionally, on May 21, 2012, Ali moved to dismiss Avaya's amended complaint on the ground that Avaya had failed to join Aspect, which Ali asserted was a necessary and indispensable party pursuant to Federal Rule of Civil Procedure 19. Motion, D. 11; Ali Brief, D. 18. The Court denied Ali's motion in a ruling from the bench at the May 31, 2012 hearing. D. 31.

Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).  The Court will

address each part of the four-part inquiry separately.

### A.       Likelihood of Success on the Merits

#### 1.       Choice-of-Law

In a diversity action such as this one, the choice-of-law rules that apply are those of the

forum state, in this case, Massachusetts.  Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496

(1941).  As a general rule, Massachusetts courts reviewing a breach of contract claim will give effect

to a choice-of-law clause included in the contract itself.  Morris v. Watsco, Inc., 385 Mass. 672, 674

(1982).   Here, the Stock Option Awards at issue all include a specific choice-of-law provision

identifying Delaware law as the relevant governing substantive law, Stock Option Awards, D. 10-3

at 12, 22, 32, and the parties do not dispute that Delaware law is controlling.

#### 2.       Underlying Breach of Contract Claim

The amended complaint underlying Avaya's instant preliminary injunction motion rests on

a breach of contract claim, coupled with a request for declaratory relief that is derivative of the

breach of contract claim.  D. 6 at 9-10.  Under Delaware law, the elements of a breach of contract

claim are "first, the existence of the contract, whether express or implied; second, the breach of an

obligation imposed by that contract; and third, the resultant damage to the plaintiff."  VLIW Tech,

LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).  Here, at least at this preliminary stage

of the litigation, it appears that Ali's conduct violates the terms of the Stock Option Award

agreements and that his conduct could benefit Aspect and damage Avaya – simply put, Ali is

working for a material competitor within the one-year non-compete window set forth in the Stock

Option Award agreements and in doing so is both depriving Avaya of his services and aiding

Avaya's competitor, to Avaya's detriment – and Ali does not assert otherwise.  The two issues before the Court are whether Avaya relied on fraud to induce Ali to agree to the Stock Option Awards, rendering the agreements unenforceable, and, even if the agreements are enforceable as a general matter, whether the specific non-compete provisions contained in the agreements are nonetheless legally unenforceable.

### a.      Fraudulent Inducement

Ali argues that Avaya fraudulently induced him to agree to the Stock Option Awards, rendering his obligations under the Stock Option Awards agreements unenforceable under both Massachusetts and Delaware law.  See St. Fleur v. WPI Cable Sys./Mutron, 450 Mass. 345, 355 (Mass. 2008) (holding that "[t]ypically, one who signs a written agreement is bound by its terms whether he reads and understands them or not," but "fraud in the inducement place[s] [a] case on a different footing"); Bowersox Truck Sales & Serv. v. Harco Nat'l Ins. Co., 209 F.3d 273, 279 (3d Cir. 2000) (holding that agreements "executed and procured by fraud" are not enforceable) (citations omitted).  Under both Massachusetts and Delaware law, to establish fraud in the inducement of a contract, a contracting party must show, among other things, that the other party falsely represented or omitted facts that the other party had a duty to disclose and that the other party intended to induce the contracting party to act or refrain from acting, Abry Partners V, L.P. v. F&W Acquisition, LLC, 891 A.2d 1032, 1050 (Del. Ch. 2006), that is, a plaintiff must show "misrepresentation of a material fact, made to induce action." Sax v. DiPrete, 639 F. Supp. 2d 165, 173 (D. Mass. 2009) (citations omitted).  Ali rests his argument on the fact that the cover letter accompanying his August 28, 2009 Form Stock Agreement stated (incorrectly) that the agreement addressed only non-solicitation, not non-competition. See Avaya Supp. Evid. Brief, D. 32 at 2-3.  However, given that Avaya explicitly

notified Ali on June 23, 2009 that to receive his stock option award, he would be required to execute an agreement that "contain[ed] standard confidentiality, non-solicitation provisions, and non-compete provisions," Compensation Model, D. 32-1 at 18, and that the August 28, 2009 cover letter was paired with a Form Stock Agreement that did actually include non-competition language identical to the non-competition provisions Ali agreed to three separate times, compare Form Stock Agreement, D. 32-2 at 12 with Stock Option Awards, D. 10-3 at 13, 23, 32, the Court finds it highly unlikely at this juncture that Ali will be able to show that Avaya misrepresented or omitted any material facts to him, or that any omission of facts (material or otherwise) was done in order to induce Ali to agree to the stock option awards rather than through an accidental oversight. Accordingly, at this stage of the litigation it appears highly likely that Ali will be bound by the terms of the Stock Option Awards he repeatedly agreed to, to the extent the awards' specific provisions are enforceable.

### b.      Enforceability of the Non-Compete Provisions

Ali argues that the non-compete provisions included in the Stock Option Awards are unenforceable under Delaware law.  Under that law, for a non-compete clause to be enforceable, it must "(1) be reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities in order to be enforceable." Concord Steel, Inc. v. Wilmington Steel Processing Co., Inc., Case No. Civ-3369-VCP, 2008 WL 902406, at *4 (Del. Ch. Apr. 3, 2008).  To obtain specific performance of a covenant not to compete, a plaintiff "must establish these elements by clear and convincing evidence." Id.  The Court will address each of these elements in turn.

### I.      Scope and Duration

The non-compete clause at issue here has a 12-month duration, which is well within the duration of time considered reasonable under Delaware law. Weichert Co. of Penn. v. Young, Case No. Civ-2223-VCL, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007) (stating that "[c]ovenants of two-years' duration are consistently held to be reasonable"). Delaware law also condones broad geographic restrictions, up to and including non-competes with a global scope like the one at issue here, when the relevant competitive market is equally broad or global. See, e.g., Research & Trading Corp. v. Pfuhl, Case No. Civ-12527, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992) (enforcing an employment agreement with "no geographic limitation" and noting that if "the employer's customer base, extends throughout the nation, or indeed even internationally, and the employee would gain from the employment some advantage in any part of that market, then it is appropriate that an employee subject to a non-competition agreement be prohibited from soliciting those customers on behalf of a competitor regardless of their geographic location"). Ali does not dispute that the scope or duration of the non-compete clause in the Stock Option Awards are unreasonable and the Court finds as a preliminary matter that they are sufficiently reasonable to permit enforcement.

### ii.      Legitimate Economic Interest

Under Delaware law, a business may enforce a non-compete provision against a former employee if they do so "to protect good will, proprietary information or other legitimate interests of [the] business," but not solely "to hamper future competition" or "to make an object lesson of [the] defendant." Lewmor, Inc. v. Fleming, 12 Del. J. Corp. L. 292, 296-97 (Del. Ch. 1986). Here, the non-competition serves multiple legitimate interests. First, although the Court does not doubt Ali's sincerity when he asserts that he "ha[s] retained little relevant information [from Avaya] that

has not become public and/or otherwise become stale" and that he "ha[s] not and will not use or

disclose to anyone any of this information," Ali Decl., D. 21-1 at ¶¶ 21-22, given the level of control

Ali quite recently had over Avaya's customer contact center business, and given the close

competition between Aspect's workforce optimization products and Avaya's workforce optimization

features marketed as part of Avaya's customer contact center products and services, "it is difficult

to conceive how all of the information stored in [Ali]'s memory can be set aside as he applies

himself to a competitor's business and its products," and, "[o]n the contrary, what [Ali] knows about

[Avaya] is bound to influence what he does for [Aspect]." Aspect, 787 F. Supp. 2d at 130 (quoting

Marcam Corp. v. Orchard, 885 F. Supp. 294, 297 (D. Mass. 1995)); see also U.S. Elec. Servs., Inc.

v. Schmidt, Case No. 12-cv-10845, 2012 WL 2317358, at *9-*12 (D. Mass. June 19, 2012)

(discussing both Marcam and Aspect). Second, given Ali's former role in charge of Avaya's client

services division, it seems highly likely that Ali's departure for Aspect could impact Avaya's

goodwill with its clients, the protection of which has "long been recognized as [a] legitimate

economic interest." Tristate Courier & Carriage, Inc. v. Berryman, Case No. CA-20574, 2004 WL

835886, at *10 (Del. Ch. Apr. 15, 2004). Accordingly, at least at this preliminary stage of the

litigation, the Court is persuaded that Avaya is attempting to enforce the Stock Option Awards' non-

compete provisions in order to protect its legitimate business interests and not, as Ali alleges, solely

in order to stifle competition.

### iii.    Balance of the Equities

Ali argues that if the non-compete provisions at issue are enforced, the harm he and Aspect

will suffer outweighs the benefit to Avaya. Ali Brief, D. 21 at 16. The Court is unpersuaded. It

appears that Ali's contract with Aspect includes provisions guaranteeing one year of salary for Ali

in the event that he is judicially enjoined from performing his work responsibilities for Aspect. See Executive Employment Agreement, D. 10-5 at 47 (defining "good reason" for Ali's resignation), 50 (discussing salary effects of resigning for "good reason"). Aspect is not a party to this litigation, and, in any event, Aspect was clearly aware of Ali's non-compete obligations to Avaya when it hired him, Tsatalis Decl., D. 10-5 at ¶¶ 2-13, limiting the force of any appeal to equity on Aspect's behalf. For the reasons set forth in the above discussion of Avaya's legitimate business interests, failure to enforce the non-compete provisions could clearly harm Avaya. The balance of the equities favors enforcement of the non-compete provisions at issue.

For all these reasons, Avaya is likely to prevail on the merits of its Delaware-law-based breach of contract claim against Ali.

### B.    Irreparable Harm

Avaya has also carried its burden of showing a likelihood of irreparable harm absent a preliminary injunction. Breach of non-competition clause cases, especially where the clauses at issue are designed at least in part to protect trade secrets, typically lead to findings of likely irreparable harm. See, e.g., New Eng. Circuit Sale v. Randall, Case No. 96-cv-10840, 1996 WL 1171929, at *1 (D. Mass. June 4, 1996) (stating that "[i]f confidential information is allowed to be revealed, the damage will have already occurred" and "[t]here is no way to assess the amount of loss that the plaintiff will sustain due to the dissemination of highly confidential material," and that, "[s]imilarly . . . 'the task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one'") (quoting Shipley Co., Inc. v. Clark, 728 F. Supp. 818, 827 (D. Mass. 1990). Given the Ali's recent role at Avaya, his current role at Aspect, and the nature of the competition between Avaya and Aspect, it is likely that Avaya will suffer irreparable harm

during the pendency of this litigation unless preliminary injunctive relief issues.

## C.      Balance of Harms

When resolving preliminary injunction motions, "[a]ny potential harm caused to [a plaintiff]

by the denial of its motion must be balanced against any reciprocal harm caused to [the defendant]

by the imposition of an injunction." Touchpoint Solutions, Inc. v. Eastman Kodak Co., 345 F. Supp.

2d 23, 32 (D. Mass. 2004).  Here, the balance of the harms regarding a preliminary injunction tip

in Avaya's favor for the same reason the balance of the equities tip in Avaya's favor regarding the

enforceability of the Stock Option Award agreements' non-compete provisions under Delaware, as

discussed in section V.A.2.b.iii above.[5]

## D.      Public Interest

A preliminary injunction is not appropriate unless there is "a fit (or lack of friction) between

the injunction and the public interest."  Nieves-Márquez, 353 F.3d at 120.  Given the public's

interest in protecting trade secrets and customer goodwill and ensuring that legally enforceable

contracts are in fact enforced, the Court finds no friction between the public interest and the issuance

of a preliminary injunction in this case.

For all the reasons set forth above, the Court finds that Avaya is entitled to preliminary

---

[5] Ali makes one additional equitable argument that applies not to the underlying
Delaware law question on the merits but only to Ali's request for injunctive relief:  that Avaya
comes to this court with unclean hands, and thus is not entitled to a grant of equitable relief such
as a preliminary injunction, because Avaya originally named Aspect as a party to the case.  Ali
Brief, D. 21 at 9-11, Ali Response, D. 35 at 4.  Ali's position is that Avaya named Aspect to
buttress its claim that the instant case should be assigned to this session because the case was
related to Aspect, which was also heard in this session, despite Avaya's knowledge that Aspect's
presence in this case would destroy diversity jurisdiction, and that (consistent with Ali's
position) Avaya promptly dismissed Aspect as a party once the instant case was assigned to this
session.  In short, Ali accuses Avaya of "judge shopping."  Ali Brief, D. 21 at 11.  This issue was
discussed at the May 31 hearing, D. 33 at 77-79, 90-91, and based on the arguments and
representations of counsel, the Court rejects Ali's unclean hands argument.

injunctive relief enforcing the Stock Option Award agreements while this litigation is pending.

### E.      Bond per Fed. R. Civ. P. 65©

Avaya argues that, because the Stock Option Award agreements include a provision wherein

Ali agrees that if he breaches the agreements, Avaya will "have the right to obtain preliminary and

permanent injunctive relief against any such breach or threatened breach without having to post

bond," Stock Option Awards, D. 10-3 at 17, 27, 34, Avaya should not be required to post a security

bond prior to the issuance of injunctive relief.  Avaya Brief, D. 10 at 15 n.2.  Federal Rule of Civil

Procedure 65 states that "[t]he court may issue a preliminary injunction or a temporary restraining

order only if the movant gives security in an amount that the court considers proper to pay the costs

and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed.

R. Civ. P. 65(c).  Of course, this rule places an obligation on the Court, not on Ali, to determine the

bond requirement.  Although there may be some circumstances in which a court may have the

discretion to require a security bond in the amount of zero, essentially doing away with the Rule 65

bond requirement, see Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers,

Helpers, Warehousemen & Packers, 679 F.2d 978, 1000 (1st Cir. 1982) (discussing hardship to the

party posting a bond and whether posting a bond would restrict a federal right unduly), rev'd on

other grounds, 467 U.S. 526 (1984), none of those circumstances are present here, and the Court

exercise its discretion to require a security bond in this case.

## VI.    Conclusion

For the reasons discussed above, Avaya's Motion for Preliminary Injunction is GRANTED,

with the exception of Avaya's request to be relieved of its obligation to post bond, which is

DENIED.  Accordingly, Ali shall be enjoined and restrained until further order of the Court from:

(1)   Performing the job role he has taken with Aspect and/or its affiliates, subsidiaries, or related entities as Chief Executive Officer in charge of Aspect's Workforce Optimization division, and from any other employment with Aspect in which he is managing, developing or marketing a product or service for use in a contact center or otherwise competing with Avaya;

(2)   Directly or indirectly using or disclosing, or attempting to use or disclose, any of Avaya's confidential, proprietary, or trade secret information, documents or materials; and

(3)   Any other conduct that violates the non-competition provisions of his Stock Option Award agreements.

However, before such an order to this effect shall issue, Avaya is required to post a bond pursuant to Fed. R. Civ. P. 65.  In the exercise of its discretion, the Court imposes a bond of $500,000.  The order of preliminary injunction will issue and become effective upon the filing of the $500,000 bond by Avaya and its notice to Ali of such filing.

**So ordered.**

/s/ Denise J. Casper
United States District Judge